Thank you, Your Honor. May it please the Court. I'm Bobby Gillen from Shreveport, and I represent American Electric Power and Southwestern Electric Power Company. I'll be referring to them as SWEPCO, which is their common name. SWEPCO is an electric public utility that's operated in Louisiana, Texas, and Arkansas for over 100 years. I hope you're going to spend a lot of time on the jurisdictional issue, whether there's jurisdiction for the appeal. I certainly will, Your Honor. Thank you. And SWEPCO seeks redress in the courts for sums due under a course of construction policy, which was issued by the defendants. The defendants in this case are underwriters. Munich Ray was actually the lead underwriter. They call it Lloyd's, but there's many, many syndicates that have subscribed to this risk. There was a master policy drafted, and from the master policy, five different policies would be issued to cover different projects. So the master policy is the key policy. Mr. Gillen, we really do know about the underlying facts, and we've read the briefs, so why don't you move to the legal issues, again, including jurisdiction on appeal. Yes, Your Honor. I certainly will. Well, the first, the issues are de novo under the policy, the de novo standard of review, and the issue is under these three key provisions, can SWEPCO file suit? And one of the key provisions is the claims section of the policy. And what it says is that the insured shall commence, quote, action, suit, or arbitration within six months. If they don't do it, you lose the rights. I'm not hearing the jurisdictional point. Did I miss it? No, ma'am. I'm sorry. Okay. You want to do that first? Judge Smith had said, well, if we don't have jurisdiction, it really doesn't matter whether the arbitration clause should or should not be enforced. All right. I will do that. I was going to focus on both, but I'll certainly do that. Let me start you off. It appeared in the supplemental letter briefs we required that you conceded that you have no jurisdiction under section 1292B. Now, is that your position? No, sir. Here's my position. What we did was appeal. We got the first judgment in from the court. And it said that it's unlikely there's going to be any further proceedings. The case was closed on paper. It said dismissed. And it said terminated. So out of an abundance of caution, we did two things. We filed an appeal, but we also filed a Rule 58 motion for clarification. The court, Judge Walter, came back and again said this is a final appealable judgment. But he said, not this one, not the new one, the prior one was a final appealable judgment. And that order was also, it was called a clarification order is how it was recorded, not a new judgment. But he didn't call it that. The court called it that, but he didn't call it that. No, but he did directly say, directly in the new ruling, that the prior judgment was the final appealable judgment. What he said was that was how he was construing it. He didn't clarify that that's what he intended. I mean, I know that's subtle. But what he did was he construed the prior order as if he was not the author of it, rather than saying my intent in entering it was yadda yadda. Well, Judge, I would say, no, he looked at it all because of our Rule 58 motion. And with all the jurisprudence presented, we presented all of these issues to him. And his order came back and said that the prior September 25th, 213 order, compelling arbitration, and staying the underlying proceedings, operates as a final appealable decision within the statutory framework of the... I totally agree, but he never says that he granted your motion for clarification. He never said he's clarifying the prior order. He never says what I meant in the prior order. Instead, he seems to be engaging in the exact same exercise we are, which is construing that order. And he construes it the way you say. I get that, but that is different from clarifying it, or redoing it, or reentering it, or whatever. But I don't think you've yet answered whether, assuming that wasn't a final order, he had this alternative ground about the 1292. And Judge Barksdale asked you, are you conceding that we lack jurisdiction over that because there was never a timely request for us to accept that appeal? Right. Well, I wanted to... It's two parts, but I will certainly answer that. So, I mean, I think it's important that we did have that, and we appealed at that point. We appealed at the time we filed the Rule 53 motion. We can answer the question. Are you conceding you do not have jurisdiction under Section 1292B that requires appealing within 10 days, and then our court permitting the appeal? Are you conceding you do not have jurisdiction? Under that section. Under that section? We did not request that. We already had an appeal filed. All right. Thank you. And what the statute says is, as you all well know, it is discretionary appeal under 1292 only, quote, if it is not otherwise appealable. We had already appealed the case. We had two rulings from the court saying it was final and appealable. So your appeal, Bill, your... The question of appellate jurisdiction rises and falls under construction of the two orders and not any discretionary yada yada. That's correct. And I was also saying that under that statute, if it is not otherwise appealable, we were reading that to say we have appealed, so do you file a motion when you've already got an appeal underway? You've already appealed and presumably moved the record to this court. I don't blame you for filing a notice of appeal even if you thought it was protective at the time, because that's just what you do to be safe for your client. Right, Your Honor. And that was the purpose of the Rule 58 also, to lay all the jurisprudence, including Frudensprung, in front of the court so they could have the benefit of all of that in making a decision. Okay. Admittedly, our jurisprudence in this area is, let's say, evolving. But it seems like our case law has drawn a distinction between dismissed, which is pretty clear, and stayed with an administrative closure, and maybe, you know, we don't think there's going to be more, but there could be more activity, and so that's what we're doing, and that the latter is not considered a final order. Well, this order did say something a little more. It said, given the unlikelihood that further proceeding in this action will be necessary. There's other cases cited where courts left it open specifically for certain actions. This case was gone. It was closed. It was terminated. Those are the exact words on Pacer, but that is the result of what happened. I don't care what Pacer says. I completely don't care, because you have the order. The order is all that governs. What some clerk in the office thinks about an order is not binding on us or the judge or anybody else. This isn't a pro se litigant who was confused or something. You have the order, and the order says stayed, and then closed the case given the unlikelihood. It does not say all possible things are terminated. This is over whatever, whatever. It says stayed, and again, I agree. Our jurisprudence is evolving. We can sit here and read all of the cases. We cited you to some specific cases to discuss, but this word stayed is really different from dismissed to me. Well, he did say stayed, but he said to close the case for administrative purposes given the unlikelihood that further proceeding in this action will be necessary. And what does that mean? What does it mean to close for administrative purposes? Well, I mean, that's, I think it means the way the clerk did it, and I understand your Honor saying you're not bound by Pacer. I understand, but there's a lot of case laws saying Pacer is important in looking at this, because I think the judge would have some input, but we cited it in our letter brief. I promise you, I've been, not in this court by any means, but I've been a state district judge for eight years. I did not sit in the clerk's office and tell them how to enter orders. I had other things to do. So if they entered an order as final when it wasn't, or as interlocutory when it was final, I didn't care. I understand. And, but, the judge reiterated that that was what he intended. On the Rule 58, he came back and said, no, that was my judgment. It was final in appeal. We've heard that. So let me just throw out here for you that across the circuit, this is a general practice. I don't know about Judge Walter, but it's generally recognized, and I don't mean this in any critical or disparaging way at all, but it's very common across the circuit for district judges to close cases administratively, cases in which not very much is happening, because there's the March 31st and the September 30th deadlines where the reports come out about pending matters, and the district judges understandably don't want their numbers to look really big when they've got cases in which there's nothing happening, and it builds up their numbers. So lots and lots of those cases, I'm just speaking from 26 years of experience sitting here, that a lot of those cases get administratively closed, and then they routinely get reopened either right after the March and September deadlines or at some point after that, and I don't know whether you agree with me that that's the practice, and again, I'm not talking about Judge Walter specifically, but that's the problem that we have if we call all of these administratively closed cases closed for purposes of appeal. And I understand that, Judge, and I would say I can't speak to all administratively closed cases. I can say in this case, there was nothing else for us to do. It was closed, it was done, it was over, and that's what the judge reiterated in the second clarification ruling. It really was closed. He said, it's unlikely there's going to be anything else. So this is, to me, to our client, it was as final an order as you can get. Isn't that true in all these other cases? I mean, you send somebody to arbitration, what are you going to do as the judge? You don't know what might come back to you, but the fact is, he didn't dismiss it. I mean, he didn't say go to arbitration, dismiss it. He stated. So our cases have made a distinction on that basis, rightly or wrongly, and maybe we need a new rule or whatever, but that's just kind of how it's been, and to me, it may seem kind of like a silly procedure, but whether we have appellate jurisdictions is a really important thing to us. We don't want to be running around. We have enough cases where we clearly do, and they need our help. We don't want to be running around ruling in cases where we don't have jurisdiction. Well, in each of those cases we're talking about, we did talk about it, and the language in those cases was somewhat different than what we got in the clarification order. That's why we asked for the clarification order. Talk about your arbitration order, unless my colleagues have questions, because I don't want to keep beating this horse. Your Honor, I want to be sure we've answered the questions, but we did brief all of this to give him an opportunity to say whatever he thought about this order, and we got the ruling back. All right. Move on to the merits, then. And as I framed the issue, this policy has a provision. The master policy is the template for the five other policies. The lead underwriter from Munich Re, they have the master policy. They put it together. In fact, that's what Mr. Clydesdale testified. We put the master policy together. One of the key issues is it requires that the insured commence action suit or arbitration within six months. It also has the provision about consent to suit, and we're not arguing just on the consent to suit clause, but it does say, it tells you how to effect service. It tells you they will submit to and abide by the jurisdiction of the courts. We certainly relied on that. We gave notice as required. We filed the suit. We perfected service. The policy also has an arbitration provision, and it, consistent with the right to sue and consistent with the consent to service and jurisdiction, it says it's bounding on the parties, quote, who consent to carry out the same. That's the last phrase, who consent to carry out the same. SWEPCO never did consent. It had an option under the claims section. It either got to take action suit or arbitration. It selected suit. And in dealing with this issue, it was brought up before the magistrate. This was a magistrate's ruling that the judge approved. The magistrate, you know, did talk about the rules of interpretation, but we would submit it didn't apply. You've got to look at the policy as a whole. You've got to look at all three of these provisions, and you've got to apply them and not make one section meaningless. What happened here is an affidavit was filed by the underwriters, and so we had to depose the affiant. And he agreed. He's the one who actually marked up in his own handwriting the policy. This is unique, because you've got before you the policy that he's scratching through and writing new words and all that. He said, I think the word suit in there is relatively clear. And he also said this paragraph provides an action or a number of actions the insured can take. He's agreeing that there were options afforded. Now, they had to take an option. You had to do one or you lose your rights. So we took an option. Then there's consent to service suit. And what he also said is all of these provisions, the consent to suit and the claim section, were market standard provisions. I've seen them before. They're not that unusual. They're market standard. Now, we haven't seen a case that addressed this claim section of a policy. We've looked and looked. And I would submit that I've not seen one cited by the underwriters either that addressed this particular provision. SWEPCO exercised its rights. And with that backdrop, the magistrate ruled that Lloyd's might elect to allow the matter to be resolved through the litigation process or it could elect to enforce the arbitration clause. Mr. Gilliam, I'm going to give you two extra minutes because we took a lot of your time on jurisdiction. Thank you, Your Honor. I appreciate it. And so he took the choice, changed the policy language and gave that choice to the insurer. And the mistake in interpretation was compounded by the fact when he said that the insurer's option of suit or arbitration was solely to allow the claimant to prevent abandonment. That's not what the policy says. And I would suggest to you that this wouldn't mean anything. If you have a right, you file suit or arbitration. But the only remedy is arbitration. I don't know why you would file suit. You would send a one-sentence email or a one-sentence fax letter and say, we hereby request arbitration pursuant to this provision. So to me, he's rendered that provision meaningless. He also erred in assuming that SWEPCO somehow consented to arbitration quote, merely by entering into the policy. That's what the decision said. I'm not sure, as we all know, a threshold question before anything else we deal with, the threshold question is whether a party is bound by an agreement containing an arbitration provision. It's got to be a binding arbitration agreement. That's in many cases from this court, including data treasurer. The magistrate's reading of the policy also, he even went so far as to suggest changes in punctuation and wording in the policy to clarify it. He said, for example, it could say that those who quote, do, and he added do, consent to carry out the same. When you start adding punctuation and language to a policy, that raises many issues. Of course, he cannot rewrite the policy. It makes, it could raise issues about clarity and ambiguity, but this is contrary to law, as he cannot rewrite the policy. And our position is, you don't have to rewrite the policy. It does provide those options, and there's a reasonable way that the provisions can be read together. If you want to start adding words and clarifying, then you do have ambiguities. All right. Thank you, Mr. Gilliam. And you've saved your full five minutes for rebuttal. Thank you. Mr. Youngjohn? May it please the Court. I think the first issue, obviously, is jurisdiction. I don't believe we should be here today, and the reason that I don't think we should be here today is because the September 25th order is clearly interlocutory in nature. I think under both the Convention and the FFA, there's not jurisdiction for this Court to consider this appeal. And I think that, as Judge Haynes showed out, the case law is clearly developing on this. From American Heritage, back, I believe, in 2004, or 2002, through to City Financial Corp. in 2006. I think what we're seeing is the Courts are more and more strictly interpreting the issue of a case closed for administrative reasons in the context of a stay for a federal arbitration that they're starting more and more to give deference to the Act that says that that order is not an appealable order and that the administrative closure is nothing but to remove it from the trial court's docket. I think... What do you make of the January order construing the September order? I mean, is that a clarification? Was it really a grant of the motion to clarify? And if it was, does that change the analysis? Well, what you mentioned this morning was something that occurred to me last night at about 10 p.m. He doesn't really say, other than he says according to Frudensprung and according to American Heritage, it is a final judgment. So I guess clarification might be an appropriate statement for it. The problem is, I think, the analysis under American Heritage and Frudensprung are not directly applicable to this. But I think he didn't purport to clarify it. That's what strikes me, is he didn't say, the motion for clarification is granted, what I meant in the prior order was to finally determine the case. He doesn't say any of that. He instead says, I construe the prior order as follows. And then that just becomes a legal point that we can construe as well. We look at all of the same cases the district court did. So I actually think it's not a clarification. But if you think it's a clarification, then what impact does that have? Because if it's a clarification, then isn't the new order the final order, and we do have jurisdiction. Well, that would be, OK. I see your point. I think the judge clearly didn't know, because then he went on to certify it for appeal under 12, what is it, 1219B. He didn't amend the order. I think that the only order, that the order can only be read, as the judge said, the September 25th order is what it is. The legal consequences of that, I've read Rule 58 many times. I can't really understand, although he didn't grant a Rule 58 motion. He did something a little different. I think it's important now, in the motion he did grant, which was our motion to compel arbitration and stay the proceedings, there was no movement for dismissal of the case. There was no request for that remedy. There was nothing that asked the court to do anything but stay it. And certainly the administrative closure is just a goes hand in glove with the stay for what would be the future activities then? He said it was unlikely to be future proceedings. Your opponent says there aren't going to be future proceedings. What would be the future proceedings, if this isn't a final determination? Under the convention, the federal court has jurisdiction of this. Now, they've referred it over to arbitration. Once the arbitration is done, there could be an award. AEP could determine to enter the award. We might obtain an award. Would there be like the issuance of subpoenas and so forth? Because I've seen that in arbitration proceedings where the arbitrators don't have the power to compel attendance of recalcitrant witnesses and so forth and come back to the district court for that. Is that the kind of thing that's contemplated or is it solely the motion to affirm or vacate? I would say that would clearly be within the realm. I'm certain that by this time, many of our former employees have gone on and will require a subpoena if we want to get their testimony. Certainly, there could be other activity for the court. The unlikeliness of further proceedings where the Rural 58 motion, I think, shows that there were further proceedings and have already been further proceedings. I think that administrative closure is a recognition of whatever probability, albeit it might be minor, therefore, it goes into administrative closure because there is an unlikelihood. It's conceivable we could work out our differences and never get back, but if we go to arbitration, something tells me we'll be back. In Texas State it's a different deal because if you've granted a final judgment, you lose plenary power after 30 days, whereas if you just administratively close the case, it remains on your docket within your power. Is there that distinction in the federal system? I would say in Texas we use the standard, and they don't like magic language, but it is magic language. If you have a final order, it needs to say it disposes of, quote... No, I know about the magic language. I'm asking you the effect of it, though. The effect is huge in Texas. I'm not sure it's the same effect in federal, so I'm asking you that distinction. I'm not saying that you know about Texas. I'm saying, assume with me that in Texas it's a huge distinction. Is that also true in federal? Does the plenary power expire? Yeah, would the court be able to come back, absent a new complaint and a new filing fee and all that, and do anything, had this been a final judgment? You know, Your Honor, that is one aspect I simply don't know. I could look it up when we get back and send you a supplement, but I just don't know as I stand here. And I think that is one thing in federal law that I've noticed in prior matters is I don't think that there's a clear and ready answer to it, even after final judgment, as we know when the appellate deadlines run, but I do think it would be pretty hard two years down the road on the back side of arbitration to try to get the judge to reopen a case that had been subject to a final judgment, but I don't know. If you should find jurisdiction, if you should disagree with me and decide to go forward into the appeal, this is the easiest part of my argument. I think that the district court judge and the magistrate got it right in all respects. I think that the way that he reconciles the three provisions at issue, the arbitration provision, the service of suit provision, and I guess the claim presentation or claim rejection languages, you can't read these in conflict with each other, and it was difficult to harmonize, but I think he clearly does a great job in harmonizing it, and the only disagreement that I have in his opinion is once he's harmonized it and he says it's unambiguous and it doesn't really matter, you guys are going to arbitration, there is one thing on the issue of consent that I think invokes a convention, because what I think I think the convention is relevant not only to jurisdiction, but I think it's also particularly relevant to the idea of consent, and the point and where I'm trying to go is, SEDCO I guess enumerated the test that I'd call the Frudensprung test, because it was set forth a little bit differently in Frudensprung, but it's very simple. Is there an agreement in writing to arbitrate? Does the agreement provide for arbitration in the territory of a convention signatory? Does the agreement arise out of a commercial relationship, and is a party to the agreement not an American citizen? Once, under the convention, you reach that test, I think every other consideration goes away. Once you find that there's an agreement in writing to arbitrate, and to my knowledge it's undisputed that elements 2, 3, and 4 exist, that once you find that, then you don't go on to the issue of consent, and setting aside the fact that I think the magistrate got it right when the parties agreed that the arbitration would be binding upon those who consent the same. And that's not exactly how it says it. He meant it was a consent at time of contracting. I think also within the framework of the convention that's correct. And the cases I'd offer in support of that would be the McDermott cases, and in particular the McDermott cases of 1991 from the Fifth Circuit, 944 F2B 1199, and then the McDermott case of 120 F3D 583, which was in 1997. Two cases. In the first one in 1991, the issue was could a defendant who had an arbitration provision in a contract subject to the convention waive his rights to removal? And I think that the reason for that is relevant to the issue of consent within our contract. And the reason why is that the court came up with the express waiver rule that you have to expressly waive your right to removal or else you've got it, you can remove any time up to trial, period. The reason that they said is that concerns of international comity, respect for the capabilities of foreign and transnational comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of international commercial systems for predictability in a resolution of disputes require that we enforce the party's arbitration agreement, even assuming that a contrary result would be forthcoming in a domestic context. Now, once you find that the arbitration provision applies, I think that that logic applies not only to the issue of removal and remand, but it also carries forward over into, you know, who consented. I don't believe that that is ambiguous. If you all disagree with me, I still think that under that theory, it has to be construed in favor of arbitration under the convention to respect our treaty rights with the other signatory natures. And to show you the point, the cases that AEP has proffered in support of arbitration provisions that were found to be unenforceable, one case they talk about considerably is the Pioneer case. In the language in Pioneer, there are several issues in Pioneer, but ultimately, the provision that they found to be at issue, and that they found to be an unenforceable, voluntary provision not enforceable under the convention was, quote, in the event it is mutually agreed by the assured and the underwriters to arbitrate any dispute arising under this policy, the matter shall be submitted for arbitration. If any dispute is not resolved through arbitration in accordance with paragraph A, it is agreed that they'll submit to a jurisdiction. Well, the mutual agreement of the assured and underwriters was plainly required by it. So I'd say that there should be an express requirement within the consent. And certainly, to the extent that you might feel ambiguity might exist in the words who consent the same, I think the public policy rules strongly that any waiver of consent should be expressed. And I would go further if you look at timber source. The policy at that issue stated, if both the non-binding arbitration, the matter will then be referred to a court. Again, they expressly put down that it is a non- binding arbitration provision. Our provision, once you're in a convention, if we go to the second McDermott case, the 1997 case, they held that consent is not required under the convention. Because the 9 U.S.C. Section 9 of the FAA conflicts with the convention. And so the fact that McDermott was objecting to the entry of the arbitrational award on grounds of consent was found not to be sufficient to save off entry of the arbitration agreement. And the court held the twin goals of uniformity and summary and speedy judicial enforcement of the arbitration decision are plainly furthered by the district court's action confirming the award. I think I don't know how they get around that over at SWEPCO. I think in the event that y'all determine to find jurisdiction, I think the convention makes it mandatory that this then goes on into arbitration. The final issue I'd like to talk about, and I might be able to give y'all some time back even, although that's a dangerous thing to say with seven minutes on the clock. On contra preferentum, the district court made one finding of fact subject to clear error, and that was neither party has plainly described how the policy came into being. I can't disagree with that. Reading through the depositions, I certainly can agree neither party has plainly described it. However, I would say the judge could go a little bit farther, or this panel could go a little bit farther with that finding and not contradict it. And the issue of contra preferentum, we cite three cases I think are relevant. The Six Flags case out of the Fifth Circuit here in 2009. The presumption does not apply where the insured is a sophisticated commercial entity that itself drafts or utilizes his agent to secure desired policy provisions. The McDermott case that we've mentioned in 1991 said that I believe it was under Louisiana law. They recognize a sophisticated insurer. And then Eagle Leasing, which was a Fifth Circuit case, admittedly under Missouri law, but it was cited in McDermott in 1991 and picked up by Six Flags in 2002. It sets forth very clearly what the logic is, and that logic is applicable to this case because if you look at the depositions of the various individuals, I guess let me kind of back up a bit and talk about surface line policies very quickly so that you can kind of have the framework, which this testimony, let me get back into the forest and not the trees. How this policy works is AEP came up with a plan. They were going to build four power plants. They went to McGriff, who was their broker in the United States. They said, McGriff, we're going to build these four power plants. We need an insurance line to put together between themselves what coverage they needed to build these four power plants. McGriff then goes to London, where there's a London-based broker called JLT. JLT is different from McGriff in that JLT has direct access to the insurance markets. McGriff can't approach the underwriters. McGriff has to go through JLT, an artifact of obscure British law. JLT, AEP, and McGriff put together a policy amongst themselves. Scott says this, if you look on the reporter's record on 845 through 846, he talks about the master policy, which was a policy that would cover all three or four construction projects. He says, it was a concerted effort amongst AEP's risk management department, McGriff, the U.S. broker, and JTL, the London broker. The purpose of the broker, and then it was assembled, what Mr. Clyde still says is, he says this both in his affidavit, which is in the reporter's record, page 38, and he says it in his deposition several times, well, he says it, I'll put it this way, he says it in his affidavit, in his deposition, he says he has proffered the language. He says on page 608, he would approve the terms that the broker presented to him. On page 596, for the stall project, he reviewed the terms and agreed to support the project. 597, he reviewed the policy when it was presented to him and agreed to write the project on the terms presented. On page 614, he says where the broker, meaning JLT, AEP's broker, where the broker would allow him to make changes to the policy, he would make the changes. On 619, what AEP cites is evidence that we underwriters put the policy together in the context of talking how the JLT presents the policy to him. He says when we negotiated this one, we put together the master policy. So that's not him saying we underwriters did it. Again, no parties plainly described it, but I think we do get into McDermott very obviously where it says, or I'm sorry, Eagle Leasing. Eagle Leasing talked about a corporation of immense size carrying insurance with premiums in six figures, managed by sophisticated businessmen and represented by counsel on the same professional level as the Council for Insurers. We didn't have counsel in the process, but they had brokers involved, and we had our underwriters involved, so they were represented by sophisticated players. Eagle Leasing says, and this is what I think the Fifth Circuit should adopt here, in substance, the authorship of the policy is attributable to both parties alike. The policy was a manuscript policy, confected of terms especially for the insured, and then presented to the insurers to underwrite. Under those circumstances, I don't think contra preferentum applies. Certainly under the Convention, I don't think contra preferentum should apply, and under the FAA, I don't think contra preferentum can apply. And I could belabor the point, but I've got two minutes on the clock. I'll gladly get back unless you guys have any questions. Thank you, Mr. John. As a point of reference, we're not you guys. I'm sorry. Your honors. All right. Thank you, Mr. Gilliam. Thank you. Thank you, Your Honor. First on the jurisdictional issue, a couple of quick points. Looking at American looking at deciding American heritage, it said that we held an administrative closing to this case, and that case was tantamount to an order closing the case and thus satisfied the Federal Arbitration Act's requirement that the order compelling arbitration be final. It also says particularly that we have repeatedly recognized that Rule 58 should be interpreted to prevent loss of the right of appeal, not to facilitate loss. That's in Prudence Front. In this case, too, we look back to the We lack jurisdiction. You wouldn't lose your right to appeal. You'd go back to the District Court, and the District Court could enter a final judgment, or you could rock on until there is a final judgment. Losing the right to appeal means that we said the time has passed, and you're forever barred. That wouldn't be the effect of us declining appellate jurisdiction or finding no appellate jurisdiction here. Okay. Thank you, Your Honor. And one other point I do want to clarify. The motion we filed was a Rule 58 motion for clarification. That's what it was called. So the judge came in and was granting the motion by saying, I'm making it clear. Judge Walter, this is in his first rodeo, he did not say, he knows what it is to grant a motion. In fact, I read it as very carefully ducking that and not granting it. But either way you look at it, it doesn't say, I'm granting the motion or the motion is granted or the order is clarified as follows. We would then be construing what that means, but he didn't do that. All right. And I accept that. I am saying though, it appeared to me, reading the words, that his intent was that that order operated as a final appealable decision within the statutory framework, as I'm reading from the order. So I would submit that's what he was trying to accomplish. On the argument on the merits, I think a couple of important points. I just heard the argument that somehow the convention applies and whether you have a binding arbitration agreement or not, you're subject to the convention. That is not the law. There's case after case after case. You have to, as a threshold, find that there is a binding arbitration agreement. And that is determined by state law. And the Pioneer case, that's exactly what happened. They applied, they looked at Texas and Louisiana law, but they found that there was two, one part of the policy was permissive, and Lloyd's wrote it, by the way, so they know how to write permissive and they know how to write binding. And the other part was mandatory. The judge said there's ambiguity, there's a conflict, and whether it's Texas or Louisiana law, then convention doesn't apply, the case is remanded. That's what Pioneer found. There's other cases too. There's a mention in the policy of Ohio law and Texas law, and that's in the policy that Mr. Clydesdale was drafting. His policy with his words and his language. So it's two states. But a case cited by Lloyd's, the Schaeffer case, is a case that was not a binding arbitration agreement, and so arbitration was not required. So arbitration, you must find there's a binding arbitration agreement before the convention comes into play. As far as what happened with the policy itself, and I've just got a little bit of time, but in the briefs you will see the direct admissions of Mr. Clydesdale. The affidavit he admitted was put in front of him by Lloyd's lawyer in London and by their chief claims guy who's handling this case. We were only allowed to do very limited discoveries, so we posed him via video in London. After we started talking about his affidavit, he admitted the many errors in the affidavit. It even referred to paragraph numbers that he said, I don't know what they are. I've never seen those paragraphs because it's referring to the course of construction policy. And he also admitted, rather than somebody giving him all this, these were all standard market provisions that I've seen many times before. And his words were, we put the master policy together, we being the underwriters. And there's many other admissions, including that I have authority to write these policies anywhere in the world, and that's what I was doing, and those on our side can ask me to amend it, they can take a lesser part of the risk, or they can reject participation. He was as clear as he could be. That's another reason why this case is, the policies in the case is a little unique. The claims section, which I have not seen interpreted by this court, and the absolute proof of their control over the policy and their issuance of the policy and his admission that he did so with you having in the record his handwritten revisions and approval of the policy. With the policy ultimately being issued by Lloyds and signed by the general officer of Lloyds. So we believe that the policy is not ambiguous, but if it is ambiguous, it should be applied. We also note that Doubletree v. Lawyers Title is a case decided this year by this court where it construed ambiguities against the insurer pursuant to Texas law. Thank you. Thank you, Mr. Gilliam. Your case and all of today's cases are under submission.